IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KEVIN SIGGERS,

               Plaintiff,

v.

JOHN LAMANNA, ET AL.,

               Defendants.

Civil Action No. 03-355E

Judge McLaughlin
Magistrate Judge Baxter

(Electronic Filing)

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE
ALTERNATIVE MOTION FOR SUMMARY JUDGEMENT**

AND NOW, come Defendants, John LaManna, Deborah Forsyth, Martin Sapko, and

Stephen Housler (hereinafter collectively referred to as "Defendants"), and the United States of

America ("United States"), by their attorneys, Mary Beth Buchanan, United States Attorney for

the Western District of Pennsylvania, Michael C. Colville, Assistant U.S. Attorney, and Douglas

S. Goldring, Assistant General Counsel for Federal Prison Industries, Inc., and respectfully move

the Court to dismiss  the Second Amended Complaint[1] filed by Plaintiff, Kevin Siggers

("Plaintiff" or "Siggers"), or, in the alternative, grant summary judgment in favor of the

Defendants.

I.      **Introduction**

Plaintiff Siggers, a federal inmate, has brought this action styled after the type recognized

by the Supreme Court in Bivens v. Six Unknown Named Agents of the Federal Bureau of

Narcotics, 403 U.S. 388 (1971).  Although this action was originally brought by the Plaintiff pro

---

[1] Although Plaintiff has captioned this as the "Amended Complaint", See Docket No. 45,
it is, in fact, the Second Amended Complaint.  Plaintiff previously submitted an Amended
Complaint on or around January 12, 2005.  See Docket No. 28.

se, he is now represented by counsel. Plaintiff's claims generally relate to alleged hazardous

work conditions at his UNICOR job assignment at the Federal Correctional Institution, in

McKean County, Pennsylvania ("FCI McKean"). As relief, Plaintiff seeks: (1) unspecified

compensatory and punitive damages from each Defendant and the United States; (2) reasonable

attorney's fees, costs, and interest; and (3) such other relief as the Court deems proper and just.

For the reasons that follow, the Court should dismiss Plaintiff's Second Amended Complaint or,

in the alternative, grant summary judgment in favor of the Defendants.

## II.    **Procedural Background**

Plaintiff commenced this action on December 9, 2003, when he filed a civil-rights

complaint with this Court. See Docket No. 5. On March 17, 2004, the Court ordered service of

Plaintiff's Complaint. See Docket No. 11. Service was returned on or around May 14, 2004, as

to all named Defendants, and the United States. See Docket Nos. 14-20. On August 13, 2004,

Defendants filed a Motion to Dismiss or in the Alternative, Motion for Summary Judgment,

along with a Brief in Support of the Motion. See Docket Nos. 22-23. Rather than responding to

that motion, Plaintiff filed a Motion to Amend the Complaint. See Docket No. 26. That motion

was filed on September 28, 2004, one day after his response to Defendants' Motion would

otherwise have been due. Id. The Court granted Plaintiff's Motion to Amend the Complaint on

January 12, 2005, and dismissed Defendants' Motion without prejudice, as moot. See Docket

No. 27. That same day, Plaintiff's Amended Complaint was filed. See Docket No. 28.

On or around April 19, 2005, Defendants filed a Motion to Dismiss the Amended

Complaint. See Docket Nos. 33-34. Plaintiff responded to that Motion on May 12, 2005. See

Docket No. 37. Defendants filed an additional brief in support of the Motion to Dismiss on June

8, 2005.  See Docket No. 38

Before the Court could rule on that motion, however, it granted Plaintiff's renewed

Motion for Appointment of Counsel.  See Docket Nos. 39-43.   On December 2, 2005, the Court

issued an Order appointing counsel to represent Plaintiff; and again dismissing without prejudice

Defendants' Motion to Dismiss and Motion as moot.  The Court further afforded Plaintiff an

opportunity to file an additional amended complaint.  See Docket No. 43.

Plaintiff filed a Second Amended Complaint on January 20, 2005.  See Docket No. 44.

Plaintiff's Amended Complaint asserts the following claims: 1) Plaintiff's First Count alleges

that he was exposed to environmental hazards inside the UNICOR factory at FCI McKean, in

violation of the Eighth Amendment, 2) Plaintiff's First Count further alleges that he was exposed

to environmental hazards inside the UNICOR factory at FCI McKean, in violation of the Fifth

Amendment Due Process Clause; 3) Plaintiff's Second Count alleges that he was negligently

exposed to environmental hazards inside the UNICOR factory at FCI McKean.[2]

## III.    Factual Background

### A.      Background

Plaintiff is Kevin Siggers, Register Number 51627-060, a Federal inmate currently

incarcerated at the Federal Correctional Institution in McKean County, Pennsylvania (FCI

McKean).  On January 24, 1992, he was sentenced in the United States District Court for the

Northern District of Ohio to a 41 month term of imprisonment, with a three year term of

supervised release to follow, for Assault of a Mail Carrier, in violation of 18 U.S.C. § 2114.  On

---

[2] Although Plaintiff had previously alleged violations of the Fifth Amendment Equal
Protection Clause, and the First Amendment, based upon a theory of retaliation, those claims
have not been included in Plaintiff's Second Amended Complaint.

January 14, 1995, he was released on supervised release. <u>See</u> Declaration of Douglas S. Goldring ¶ 3, and Attachment A.

On or about February 26, 1998, the United States District Court for the Northern District of Ohio committed Plaintiff to Bureau of Prisons custody for 60-day study pursuant to 18 U.S.C. §§ 4241-4245, for a determination of his mental competency to stand trial. <u>See</u> Declaration of Douglas S. Goldring ¶ 4, and Attachment A.   On May 1, 1998, at the conclusion of the study, Plaintiff was released.  <u>See</u> Declaration of Douglas S. Goldring ¶ 5, and Attachment A.  On August 5, 1998, Plaintiff was sentenced in the United States District Court for the Northern District of Ohio to a 117-month term of imprisonment, with a five year term of supervised release to follow, for a violation of 18 U.S.C. §§ 2113(a), 2113(d), Armed Bank Robbery, and for a violation of 18 U.S.C. § 924(c)(1), Use of a Firearm During a Crime of Violence.  His sentence commenced upon imposition on August 5, 1998.  Plaintiff's projected satisfaction date from his sentence was May 17, 2006.  <u>See</u> Declaration of Douglas S. Goldring ¶ 5, and Attachment A.

On August 11, 1998, Plaintiff's supervised release was revoked, and a 15 month supervised release violator (SRV) term was imposed.  The court directed the SRV term run consecutive to his 117-month sentence.  <u>See</u> Declaration of Douglas S. Goldring ¶ 6, and Attachment A. Plaintiff's SRV term will commence on May 17, 2006, upon satisfaction of the 117-month sentence.  Assuming Plaintiff receives all good conduct time available to him under 18 U.S.C. § 3624(b), his projected satisfaction date for the SRV term is June 18, 2007, via Good Conduct Time release.  <u>See</u> Declaration of Douglas S. Goldring ¶ 6, and Attachment A.

On June 29, 2000, Plaintiff was designated to FCI McKean.  <u>See</u> Declaration of Douglas

S. Goldring ¶ 7, and Attachment A. On or about March 23, 1999, Plaintiff was first assigned to

the Federal Prison Industries, Inc. ("FPI" or trade name "UNICOR") factory.  See Declaration of

Martin Sapko ¶ 6, and Attachment B.  With a few minimal exceptions, Plaintiff has maintained a

UNICOR work assignment in the UNICOR factory continuously since that time.

FPI is a wholly-owned government corporation, created by Congress in 1934 with the

mission of providing work simulation programs and training opportunities for inmates confined

in federal correctional facilities.  In order to achieve this goal, FPI operates factories in over 100

locations across the country.  It manufactures products and services in seven different business

groups: Electronics, Clothing & Textiles, Fleet Management & Vehicular Components, Services,

Office Furniture, Recycling, and  Industrial Products.  See Declaration of Martin Sapko ¶ 3.

Typically, each prison (with the exception of minimum security and

administrative/pretrial facilities) in the Federal system contains one UNICOR factory which is a

division of one of the above referenced business groups.  At all times relevant to this case, the

factory at FCI McKean was part of the Office Furniture Business Group.  See Declaration of

Martin Sapko ¶ 4.

**B.    OSHA Inspection**

On July 3, 2001, the Area Director of the Occupational Safety and Health Administration

("OSHA") sent a letter to Stephen Housler, the Safety Manager at FCI McKean.  The letter

advised  Housler that OSHA had received a notice of safety hazards regarding the ventilation

system in the UNICOR factory at FCI McKean.  Specifically, the notice of safety hazards alleged

that  ventilation was inadequate,  employees were being exposed to excessive wood dust, and that

dusk masks were not readily available.  The letter indicated that OSHA had not made any

determination that the alleged hazards existed, nor did OSHA intend to conduct an inspection at that time.  Nevertheless, since allegations of violations and/or hazards had been made, OSHA requested that FCI McKean  investigate the alleged conditions and make any necessary corrections or modifications.  See Declaration of Stephen Housler ¶¶ 8-10, and Attachment A.

The Warden responded to OSHA's concerns on July 27, 2001.  In that letter, he described the current dust collection system in place in the UNICOR factory and indicated that dust masks are available in the UNICOR tool room, and are issued upon request.  See Declaration of Stephen Housler  ¶ 11, and Attachment B.

Specifically, the UNICOR factory at FCI McKean is equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal.  The dust collectors each have the capacity to move  34,000 cubic feet of air per minute from the UNICOR factory. See Declaration of Martin Sapko, ¶ 7, and Attachment C.

The dust collection system is connected to the furniture-manufacturing machinery in the UNICOR building.  According to operational procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be operated unless the dust collection system is turned on first.  See Declaration of Martin Sapko, ¶ 8.

Dust and air entering the dust collection system are moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building.  The vacuum pulls dust and air from the factory to one of the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a hopper, which is also located outside of the UNICOR building.  The filtered air is then returned to the factory though square ducts.  The dust that is filtered from the factory air is collected in a

hopper and disposed at a site away from FCI McKean and the UNICOR factory. See Declaration of Martin Sapko, ¶ 10, and Attachments D and E.

On July 31, 2001, in response to the letter from OSHA, FCI McKean had Microbac Laboratories, Inc. conduct an indoor air quality survey of the UNICOR factory at FCI McKean. Microbac tested six different sites in the factory, and all of the sites complied with the OSHA standard for total Particulates/Nuisance Dust. See Declaration of Stephen Housler ¶ 12, and Attachment C.[3]

On April 14, 2003, OSHA issued a Notice of Alleged Safety or Health Hazards to FCI McKean. The OSHA notice alleged that the ventilation in the UNICOR factory was inadequate to control the hazards associated with dusts generated during the production processes. The dusts included wood dust, particle board dust and Micoreboard dust. The Notice also alleged that the ventilation was inadequate to control the hazards associated with vapors that were produced by glues utilized in the laminating processes. See Declaration of Stephen Housler ¶¶ 14-15, and Attachment D.

On or about Wednesday, April 16, 2003, a compliance officer from OSHA visited the UNICOR factory at FCI McKean and conducted a walk-through inspection. At the conclusion of the walk-through, the OSHA inspector gave a verbal indication to Defendant Housler that he found no evidence of concern related to the air quality in the factory, and that all appropriate and

---

[3]Indeed, the survey results showed that the air quality was well within the OSHA standards. According to the Microbac Laboratories Summary, the OSHA standard for Total Particulates/Nuisance Dust is 15 mg/cubic meter and 5.0 mg/cubic meter for Respirable Particulates/Respirable Nuisance Dust. According the Microbac survey, the highest measurement for total particulates was 0.3 mg/cubic meter, and the highest measurement for respirable particulates was 0.4 mg/cubic meter. See Declaration of Stephen Housler ¶ 13, and Attachment C.

necessary practices were being followed in accordance with OSHA regulations. The inspector indicated that OSHA inspectors would return to the UNICOR factory to conduct a formal inspection. See Declaration of Stephen Housler ¶ 16.

On May 14, 2003, the OSHA Compliance Officer conducted an inspection of the UNICOR factory. On June 17 and 18, 2003, representatives from OSHA returned to FCI McKean to conduct an air monitoring of the UNICOR factory. On or about June 18, 2003, after the air monitoring inspection, the OSHA Industrial Hygienist told Defendant Housler that the air monitoring had gone well, and he did not foresee any violations with respect to the air quality in the UNICOR factory. See Declaration of Stephen Housler ¶ 17.

In a letter dated August 20, 2003, OSHA informed FCI McKean that no OSHA standard applied to the alleged hazards, and no OSHA citation would be issued for the alleged hazards. The letter included results of the OSHA air monitoring, which had evaluated worker exposures to airborne dust concentrations of vitreous fiber and perlite. The results showed that no worker's exposure exceeded 10% of the relevant exposure limit. See Declaration of Stephen Housler ¶ 18, and Attachment E.

Also, between April 16, 2003, and August 1, 2003, OSHA inspectors evaluated the entire UNICOR factory and the FCI McKean prison compound, and on August 20, 2003, a Notice of Unsafe or Unhealthful Working Conditions was issued. No OSHA violations relative to Plaintiff's complaint was noted. See Declaration of Stephen Housler ¶ 19, and Attachments F and G.

By letter dated September 22, 2003, Defendant LaManna informed OSHA that FCI McKean had taken corrective measures regarding all of the identified Unsafe Working

Conditions, with four exceptions, which were awaiting additional information from the Bureau of

Prisons Central Office.  See Declaration of Stephen Housler ¶ 19, and Attachments G.

## IV.    Legal Arguments

### A.    Standard for Summary Judgment[4]

Federal Rule of Civil Procedure 56 provides that summary judgment shall be rendered

"forthwith" if there is no genuine issue as to any "material fact."  In recent years there has been a

dramatic change and much greater willingness of the courts to grant this remedy.  Older case law

would not grant summary judgment if there was the "slightest doubt" about the facts of a case.

Moore's Fed. Prac., vol. 11 §56.03[1], pp. 56-22 to 56-23.  However, in 1986 the Supreme Court

decided three cases which greatly liberalized summary judgment practice and encouraged a much

greater use of summary judgment by trial courts.  See Matsushita Electrical Industrial Co. v.

---

[4] In the alternative, Defendants also seek dismissal of the complaint pursuant to Fed. R. Civ. Pro. 12(b)(6).    In a Rule 12(b)(6) Motion to Dismiss, the complaint is liberally construed, and all well-pleaded fact allegations, and any reasonable inferences to be drawn from the facts alleged, viewed in the light most favorable to the non-moving party.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F. 3d 1380, 1384 (3rd Cir. 1994). This concession of truth, however, goes only to well-pleaded fact allegations, not legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  See Mires v. Dekalb County, Ga., 433 U.S. 25, 27 n. 2 (1977); Wilson Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir. 1993); Davidson v. State of Ga., 622 F.2d 895 (5th Cir. 1980); Wilson v. Lincoln Redevelopment Corp., 488 F.2d 339 (8th Cir. 1973); Stanturf v. Sipes, 335 F.2d 224 (8th Cir.), cert. denied, 379 U.S. 977, 85 S.Ct. 676 (1965); Violenti v. Emory Worldwide A-CF Co., 847 F. Supp. 1251, 1255 (M.D. Pa. 1994).

Moreover, the claimant must set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.  See Fed. R. Civ. Pro. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 45-6 (1957).

In short, the court must dissect the complaint, eliminate mere rhetoric, legal conclusions and unsupported factual conclusions, and determine whether or not well-pleaded fact allegations, when construed in a light more favorable to the Plaintiff, state a factual claim on some legal theory upon which relief can be granted, but not whether a plaintiff will ultimately prevail on that claim.  Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).

Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348 (1986); Anderson v. Liberty Lobby, Inc. 477

U.S. 242, 106 S.Ct. 2505 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986);

11 Moore's Fed. Prac., supra, p. 56-24.

> As stated by Chief Justice Rehnquist, summary judgment now:
> is properly regarded not as a disfavored procedural shortcut but rather as an
> integral part of the Federal Rules as a whole... Rule 56 must be construed with due
> regard not only for the rights of person asserting claims and defenses tried to a
> jury, but also for the rights of persons opposing such claims and defenses to
> demonstrate in the manner provided by the Rule, prior to trial, that the claims and
> defenses have no factual basis.

Celotex, 477 U.S. at 327, 106 S.Ct. at 2555. "Modern, post-trilogy summary judgment

doctrine is a stronger and more aggressive approach to summary judgment practice that places a

reduced burden on the movant, greater burdens on the nonmovant, and makes summary judgment

more likely to be granted than the pre-trilogy approach." Moore's Fed. Prac., vol. 11, p. 56-

312.1.

One of the essential purposes of the motion is to "isolate and dispose of factually

unsupported claims or defenses." Celotex, 477 U.S. at 323-324, 106 S.Ct. at 2552-2553. The

defendants have the initial burden of showing that there is an absence of evidence to support an

essential element of the plaintiff's case; and then the plaintiff has the burden to come forward

with "specific facts" showing that there is a genuine issue for trial. LaBounty v. Coughlin, 137

F.3d 68, 73 (2nd Cir. 1998). The failure to sufficiently support all elements necessary to support

a case will render all other facts immaterial. Celotex, 477 U.S. at 323, 106 S.Ct. at 2553;

Moore's Fed. Prac., vol. 11, p. 56-143.

The fact that a plaintiff has some facts on his side, or that there are some factual disputes,

is not enough to deny the motion. The "mere existence of a scintilla of evidence in support of

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512; Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S.Ct. at 1356 (The motion will not be denied merely because of "some metaphysical doubt" about the material facts); Davidson v. Scully, 114 F.3d 12, 14 (2nd Cir. 1997)(The existence of "some" alleged factual dispute is not enough to defeat summary judgment, the opponent must show that there is no "genuine" issue of material fact"); Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2nd Cir. 1996)(Mere "conclusory allegations, speculation or conjecture" also will not defeat the motion); Sunshine Brooks Ltd. v. Temple University, 697 F.2d 90 (3rd Cir. 1982)(The responding party may not rest on the allegations of his/her pleading but must present by affidavit or otherwise specific facts sufficient to create a genuine issue of material fact. Fed.R.Civ.P. 56(e)).

Professor Moore uses an illustration to show the foregoing need for a genuine issue of fact: "If plaintiff alleges the light was green in his favor but an actual and authentic videotape of the intersection at the time of the accident and 40 uninterested witnesses all attest to the light being red against plaintiff, there appears to be no need for a trial on this question: the court can safely decide the light was red. If this fact is determinative (e.g., the defendant cannot be negligent under these circumstances or plaintiff's contributory negligence in running the red light bars recovery), the court may grant summary judgment for defendant in this hypothetical intersection accident case." Moore's Fed. Prac., vol. 11, pp. 56-99 to 56-100.

**Bivens Action**

> **B.** **Plaintiff's Allegations Regarding Conditions in the UNICOR Factory Cannot Establish an Eighth Amendment Violation**

Plaintiff's allegation that Defendants violated his Eighth Amendment rights by allegedly exposing him to environmental hazards must be dismissed because it is clear that Plaintiff has satisfied neither the objective nor subjective prongs of the Eighth Amendment test. Farmer v. Brennan, 511 U.S. 825 (1994); Helling v. McKinney, 509 U.S. 25, 33-34 (1993).

> **1.** **The Eighth Amendment Standard**

In Helling v. McKinney, 509 U.S. 25 (1993), the Supreme Court held that a cause of action exists under the Eighth Amendment when a prisoner alleges that prison officials have exposed him, with deliberate indifference, to levels of environmental tobacco smoke ("ETS") that pose an unreasonable risk of harm to his future health. Id., at 35. In Helling, the Court established a two-part test that a plaintiff must satisfy to state a valid claim under the Eighth Amendment. The first prong is objective. The Plaintiff must show that "he himself is being exposed to unreasonably high levels of ETS." Id. at 35 (emphasis added). With respect to this prong, the Eighth Amendment requires a court not only to make a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to the contaminant, but also "to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Id. at 36 (emphasis in original).

The second prong is a subjective one: a plaintiff must show that prison officials were deliberately indifferent to a serious risk of harm. Id. The Supreme Court has held that:

a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts for which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In this case, Plaintiff alleges that he was exposed to Micore board fibers and Lokweld adhesive without appropriate ventilation and/or protective gear. However, the evidence presented by Plaintiff with respect to this claim fails to establish either prong of the Helling test, because Plaintiff cannot show that he was exposed to "unreasonably high" levels of air pollution or toxins, or that Defendants exhibited deliberate indifference to such exposure.

### 2. Plaintiff Cannot Establish that he was Actually Exposed to "Unreasonably High Levels" of Hazardous Substances

With respect to the first prong of the Eighth Amendment analysis, Plaintiff cannot show that he was exposed to levels of air pollution or toxins in the UNICOR factory that were so unreasonably high as to violate contemporary standards of decency. Although Defendants agree that crystalline silica, an ingredient in Micore Boards, is classified as a human carcinogen, respirable silica was not detected in 2001 by Microbac Laboratories or in 2003 by OSHA inspectors. See Declaration of Stephen Housler ¶¶ 12-13 and 18, and Attachments C and E. Indeed, with respect to all of the chemical components of Micore Board, the OSHA inspectors determined that no UNICOR worker's exposure exceeded 10% of the relevant exposure limit. See Declaration of Stephen Housler ¶ 18, and Attachment E. Thus, OSHA determined that Plaintiff and other workers were not exposed to inappropriate levels of contaminants in the UNICOR factory. Plaintiff simply cannot, in this case, "show that he himself is being exposed to

unreasonably high levels of" harmful substances, as required by <u>Helling</u>, where the UNICOR

facility is in compliance with relevant federal air quality standards.

Additionally, in the Second Amended Complaint, Plaintiff alleges that Defendants'

failure to provide him with a NIOSH-approved respirator also constituted a violation of his

Eighth Amendment rights.  The Micore Fiber MSDS sheet clearly discusses the circumstances

under which a NIOSH-approved respirator should be used. Section VIII of the MSDS sheet

indicates that special respiratory protection is "not typically necessary under normal conditions of

use."    <u>See</u> Declaration of Stephen Housler ¶ 21, and Attachment H.    A NIOSH-approved

respirator is necessary only "in poorly ventilated areas, if TLV is exceeded and/or when dusty

conditions exist."  <u>See</u> Declaration of Stephen Housler ¶ 23, and Attachment H.   Here, however,

Defendants' evidence establishes that Plaintiff was exposed only to air that comported with

federal guidelines, was not poorly ventilated or unusually dusty, and that any American might be

exposed to on a daily basis in the course of his or her job.  <u>See</u> Declaration of Stephen Housler ¶¶

18 and 24, and Attachments C, E and H; Declaration of Martin Sapko ¶¶ 7-10, and Attachments

C-E.

Based upon the tests and inspections conducted by the OSHA inspectors, the conditions

in the UNICOR factory did not require the Defendants to take any other precautions with respect

to the use and processing of Micore Board.  <u>See</u> Declaration of Stephen Housler ¶¶ 18 and 23,

and Attachments E and H.  Although several suggestions were made to increase the safety

measures available to personnel assigned to the UNICOR factory, these were recommendations

only, and OSHA fully recognized that levels of contaminants in the UNICOR factory were well

within the applicable guidelines.  <u>See</u> Declaration of Stephen Housler ¶ 18, and Attachment E.

Because the respiratory exposure level for dangerous contaminants amounted to a mere 10% of the relevant exposure limit, and BOP did not violate requirements regarding safety precautions, the risk to Plaintiff simply cannot amount to a level so grave that it violates contemporary standards of decency as required under the Helling test. OSHA standards reflect contemporary standards of decency – our society willingly exposes free citizens and inmates alike to toxins, chemicals, and particulates up to the threshold values established by OSHA. See, e.g., Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir., Feb 17, 2005); Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004). The conditions present in the UNICOR building did not violate OSHA standards. As such, Plaintiff cannot, and has not, established the objective prong of the Eighth Amendment test, and his Eighth Amendment claim must be dismissed.

Numerous cases support the proposition that an inmate's Eighth Amendment claim based on exposure to hazardous substances or poor air quality cannot survive summary judgment where the correctional facility is in substantial, even if imperfect, compliance with the relevant state and/or federal standards. The United States District Court for the Western District of New York recently addressed a § 1983 claim by pro se prisoners that New York state correctional officials had violated their Eighth Amendment rights by exposing them to inadequate ventilation and poor air quality at their inmate work assignments. See Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir. Feb. 17, 2005). The inmates, who worked in a print shop, alleged that the ventilation system and air quality in the shop were inadequate, causing them headaches, nausea, skin irritation, increased blood pressure, and sinus problems. See Wooten, 2004 WL 816919 at *1. In support of their claims, plaintiffs submitted a

report by an OSHA specialist that he had concerns regarding the ability of the ventilation system

to remove toxic chemicals from the breathing zones of the workers in order to create a safe

working environment.  See id.  The OSHA specialist had not taken air quality samples.  An

industrial hygienist associated with the state department of corrections later conducted air quality

tests to determine whether employees were being exposed to hazardous chemicals at levels that

exceeded state guidelines.  Id. at *2.  The air quality tests confirmed that the substances tested

were below the permissible levels set by the state.  Id.  Based on the air quality tests, the

correctional officials determined that the air quality in the print shop did not pose an

unreasonable risk to inmate employees' health.  Id.

     The Wooten Court agreed with the correctional officials' decision and granted summary

judgment in their favor.  The Court concluded that plaintiffs had not shown that the allegedly

poor ventilation in the print shop was serious enough to satisfy the objective element of their

Eighth Amendment claim.  Id. at *5.  The Court acknowledged that plaintiffs' evidence had

shown that OSHA had made recommendations for improvements to the print shop air quality.

Id.  However, plaintiffs' evidence did not show that the air quality failed to comply with federal

workplace safety standards.  Id.  Moreover, defendants' evidence regarding air quality indicated

that print shop workers were not being "excessively exposed to hazardous materials."  Id.

Finally, plaintiffs had not offered evidence to show that defendants' air quality tests were

erroneous or unreliable.  Id.  Accordingly, plaintiffs failed to raise a triable issue of fact with

respect to the objective element of their Eighth Amendment claim.  See also Saahir v. Holligan,

2004 WL 1418790 (N.D. Tex., June 24, 2004)(granting summary judgment to state prison

officials in § 1983 Eighth Amendment claim by asthmatic inmate who alleged his work

assignment in boot factory exposed him to hazardous chemicals, dust, and glue fumes. Defendants were entitled to summary judgment based on fact that boot factory had been inspected and air quality met OSHA standards).

Similarly, the United States District Court for the District of Delaware granted summary judgment in favor of state correctional officials on an inmate's claim that he was exposed to unreasonably high levels of environmental tobacco smoke ("ETS"), in violation of his Eighth Amendment rights. See Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002). In Baker, the inmate provided an affidavit that he was exposed to "cloudy," "very smoky" conditions, as well as a chart detailing the time of day and the number of inmates smoking at any given time over the course of a five-day period. Id. He also produced affidavits from several other inmates in support of his claims. Id. The Baker Court granted summary judgment in favor of defendant prison officials because, even if plaintiff had shown that he was subject to some level environmental tobacco smoke, he had not "provid[ed] competent evidence as to the level of such ETS." Id. Accordingly, the Court found that the inmate failed to meet the Supreme Court's requirement in Helling that he show that his exposure to a toxin "created a risk [that] is so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Id. (quoting Helling, 509 U.S. at 36). See also Jones v. Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001)(granting defendant correctional officials' 12(b)(6) motion on inmate's Eighth Amendment claim where plaintiff inmate could not show that he himself was being exposed to "unreasonably high levels" of environmental tobacco smoke, because the institution had an "open air only" smoking policy).

Here, like the inmate in <u>Baker</u>, Plaintiff Siggers cannot show that he was exposed to a level of air pollution, dust, or toxins that created a risk so grave as to violate contemporary standards of decency. To the contrary, Defendants have come forward with conclusive evidence establishing that the UNICOR factory certainly did not expose Plaintiff to that kind of risk. <u>See</u> Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E.

Courts have granted summary judgment in favor of prison officials even where the correctional facility is <u>not</u> in compliance with applicable federal standards. In <u>Carroll v. DeTella</u>, 255 F.3d 470 (7th Cir. 2001), the United States Court of Appeals for the Seventh Circuit granted summary judgment in favor of Illinois correctional officials on plaintiff's Eighth Amendment claim that the prison drinking water was contaminated with radium. There, it was undisputed that the radium levels in the drinking water of the correctional facility <u>did</u> exceed the maximum level set by the United States Environmental Protection Agency ("EPA"). <u>See id.</u> at 472. However, despite the fact that the correctional facility's radium level continued to exceed the federal maximum, the state environmental agency informed the plaintiff-inmate that other communities in Illinois had water supplies that also exceeded the federal maximum. Plaintiff was also informed that no remedial action would be taken to address radium levels, because the EPA was considering raising the maximum level. However, at the time the plaintiff filed suit, the EPA had not raised the radium standard, and the plaintiff continued to be subject to radium levels that violated the applicable federal standards. Nonetheless, the Seventh Circuit affirmed the District Court's grant of summary judgment in favor of prison officials.

In granting summary judgment, the <u>Carroll</u> Court recognized that prisons are not under a duty to provide a maximally safe environment, completely free from pollution or safety hazards.

Id.  Because many Americans live under conditions of exposure to various contaminants, the

Court acknowledged that the Eighth Amendment does not require prisons to provide prisoners

with "more salubrious air, healthier food, or cleaner water than are enjoyed by substantial

numbers of free Americans."  Id. (internal citations omitted).  As the Court recognized:

> It would be inconsistent with this principle to impose upon prisons in the name of
> the Constitution a duty to take remedial measures against pollution or other
> contamination that the agencies responsible for the control of these hazards do not
> think require remedial measures.  If the environmental authorities think there's no
> reason to do anything about a contaminant because its concentration is less than
> half the maximum in a proposed revision of the existing standards, prison officials
> cannot be faulted for not thinking it necessary for them to do anything either.
> They can defer to the superior expertise of those authorities.

Id. at 472-73.

Here, Plaintiff Siggers is being exposed to air quality and working conditions that OSHA

and our society deem to be entirely acceptable for all persons, whether free or incarcerated.

Accordingly, Plaintiff simply cannot show that he was subjected to "unreasonably high" levels of

air pollutants.  Rather, he has failed the objective portion of the Helling Eighth Amendment test,

and summary judgment must be entered in favor of Defendants.

### 3.    Plaintiff Cannot Establish Deliberate Indifference on the Part of Prison Officials[5]

Even assuming that Plaintiff had satisfied the objective portion of the Eighth Amendment test, which he has not, he cannot show deliberate indifference on the part of prison officials, as required by the subjective portion of the Helling test.  As discussed in section 2, supra, Defendants' compliance with OSHA standards clearly insulates them from liability.  See Helling v. McKinney, 509 U.S. 25 (1993); Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir., Feb 17, 2005);  Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004);  Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002); Jones v. Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001).  Furthermore, even assuming, arguendo, that Defendants' compliance with OSHA standards is not enough, Defendants respectfully assert that they did evaluate, and comply with, the Material Safety Data Sheets for substances utilized in the UNICOR factory.

---

[5] Pursuant to the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correction facility, for mental or emotional injury suffered while in custody without a **prior showing of physical injury**."  PLRA, 42 U.S.C. § 1997e(e)(emphasis added).  Mitchell v. Horn, 318 F.3d 523, 533-36 (3d Cir. 2003); Davis v. District of Columbia, 158 F. 3d 1342 (D.C. Cir. 1998); Zehner v. Trigg, 133 F. 3d 459 (7th Cir. 1997). It is well settled that fear of a future medical condition does not constitute a physical injury for purposes of the PLRA.  See Fontroy v. Owens, 150 F.3d 239, 243 (3d Cir. 1998); Herman v. Holiday, 238 F.3d 660, 665-66 (5th Cir. 2003)(§ 1997e(e) bars claims for mental and emotional damages caused by the fear that one's exposure to environmental hazards may result in exposure related diseases). Additionally, during the periods of time in which Plaintiff was assigned to the UNICOR factory, he neither reported  any work-related health problems, nor did his medical records indicate that he suffered from any work related health problems or injuries.  See Declaration of Douglas S. Goldring ¶ 8, and Attachment C; Declaration of Stephen Housler ¶¶ 35-36; Declaration of Martin Sapko  ¶ 11; Declaration of Debora Forsyth ¶ 7.  Therefore, his Eighth Amendment claim relating to exposure to environmental hazards must be dismissed pursuant to the PLRA, 42 U.S.C. § 1997e(e).

Courts have established that, with respect to the subjective prong of the Eighth Amendment analysis, defendants are not deliberately indifferent to plaintiffs' health where they conduct air quality testing and results comply with federal standards.  In Carroll, the Seventh Circuit stated that even if inmate print shop employees had met the objective portion of their burden, they could not satisfy the subjective element despite the fact that defendants were on notice that the ventilation system may have needed improvements.  See 2004 WL 816919, at *5. "Any claim that defendants were aware that the conditions in the Print Shop posed an excessive risk to plaintiffs' health is belied by the subsequent inspections of the Print Shop, which revealed that the air quality was acceptable according to federal standards." Id. at *5.

Here, as in Carroll, OSHA conducted air quality tests and concluded that the air quality in the UNICOR factory was well within applicable acceptable guidelines for the relevant contaminants.  See Declaration of Stephen Housler  ¶¶ 12-13, 18, and Attachments C and E.  It was thus reasonable for FCI McKean to rely on available air quality test results to determine what, if any, safety equipment it needed to make available for staff and inmates assigned to the UNICOR factory.  There is no genuine issue of fact as to whether Defendants were both aware of, and disregarded, an excessive and serious risk to Plaintiff Siggers's health.  The Court may not hold Defendants to a higher standard than that required by federal agencies who are charged with monitoring workplace safety.  Therefore, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim, and it must be dismissed from this civil action.

Moreover, even if compliance with OSHA standards was not sufficient to insulate Defendants from being deemed deliberately indifferent, Defendants also relied on, and acted consistently with, the applicable MSDS sheets and product warning labels in determining what

protective equipment to provide for UNICOR employees.  MSDS sheets are required to, and do,

list risks associated with overexposure to various chemicals.  More importantly, however, the

MSDS sheets set forth what precautions, if any, must be taken in order to protect against such

risks.  See Declaration of Stephen Housler ¶ 22.  Defendants' decisions regarding the UNICOR

work environment and protective equipment were consistent with the MSDS sheets and with

product warning labels.  See Declaration of Stephen Housler ¶¶ 21-27, and Attachments C, E, H,

and I.

     The product warning label for Micore Board states: "Dust hazard.  Cut and trim with

knife, razor, or hand saw.  Do not cut with power equipment unless a dust collector is used on the

equipment or local exhaust is used and a NIOSH/MSHA-approved respirator is worn."  See

Declaration of Stephen Housler ¶ 27, and Attachment H.  Defendants do not dispute that power

equipment was used to cut Micore Board.  However, in accordance with the Micore 300 label,

the UNICOR factory employed a dust collector on the cutting equipment.  See Declaration of

Stephen Housler ¶ 25; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E.  Because the

UNICOR factory used a dust-collector system instead of local exhaust, a NIOSH/MSHA-

approved mask was not required.  See Declaration of Stephen Housler ¶¶ 23-27, and Attachments

H-I.

     The MSDS for Micore Board is also instructive in establishing that NIOSH/MSHA-

approved masks are not required when a dust collecting system is in use.[6]  See Declaration of

---

[6]Pursuant to the Hazard Communication Standard ("HCS") promulgated by OSHA,
chemical manufacturers and importers must evaluate the hazards of the chemicals they produce
or import.  Using that information, they must prepare labels for containers, and the more detailed
MSDS technical bulletins.  Chemical manufacturers, importers and distributors of hazardous
chemicals are required to provide the appropriate labels and MSDS to the employer to which

Stephen Housler ¶¶ 23-26, and Attachment H. An MSDS is a technical bulletin prepared by chemical manufacturers and importers to supplement the information contained on product labels. 29 C.F.R. § 1910.1200, App. E. Pursuant to OSHA regulations, employers may rely on the information contained on the product labels, as supplemented by the MSDS, and have no independent duty to analyze the chemical or evaluate the hazards of it. See Declaration of Stephen Housler ¶ 22.

Section VII of the MSDS for Micore Board provides:

**Respiratory protection:** Not typically necessary under normal conditions of use. Provide general ventilation and local exhaust ventilation to meet TLV [(Threshold Limit Values)] requirements of individual ingredients and to control dusting conditions. Wear a NIOSH/MSHA-approved dust respirator in poorly ventilated areas, if TLV is exceeded, and/or when dusty conditions exist. Avoid prolonged and repeated breathing of dust.

See Declaration of Stephen Housler ¶ 23, and Attachment H.

Thus, according to the MSDS for Micore Board, there are three situations which would necessitate the use of respirators when working with Micore Board: (1) in poorly ventilated areas; (2) if Threshold Limit Values are exceeded; or (3) when dusty conditions exist. See Declaration of Stephen Housler ¶ 24, and Attachment I. However, the air quality tests performed by OSHA in the UNICOR factory definitively establish that the UNICOR factory was not poorly-ventilated, that the Threshold Limit Values for hazardous ingredients of Micore Board were not exceeded, and that dusty conditions did not exist. See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E. Indeed, the evidence shows that air quality tests conducted in 2001 and 2003, by Microbac Laboratories and by OSHA, respectively, revealed that the respiratory

they ship the chemicals. 29 C.F.R. §1910.1200, App. E. See Declaration of Stephen Housler ¶ 22.

particulates were well below applicable OSHA limits.  <u>See</u> Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E.   More specifically, with respect to the level of dust in the UNICOR factory, the objective air quality tests show that the total particulate level was 1.1 mg per cubic meter, which is well below the applicable TLV standard for total Particulates/Nuisance Dust – 15 mg per cubic meter.  <u>See</u> Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E.

Additionally, it is clear that the FCI McKean UNICOR factory was more than adequately ventilated.  Specifically, the factory is equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal.  The dust collectors have been operational in the UNICOR factory at FCI McKean since approximately September 11, 1989, and each of the two dust collectors has the capacity to move  34,000 cubic feet of air per minute from the UNICOR factory.  <u>See</u> Declaration of Martin Sapko ¶7, and Attachment C.

The dust collection system is connected to the furniture-manufacturing machinery in the UNICOR building.  According to operational procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be operated unless the dust collection system is turned on first. <u>See</u> Declaration of Martin Sapko¶8.

Micore Board is initially cut to size on the SCMI Horizontal Beam Panel Saw. This machine has two dust collection connections: (1) a six inch port connected to the bottom and (2) a five inch port connected to the top portion of the machine.  Each of these connections provides dust collection to the saw blade at the point of machining.  In the next step of the process, the four edges of the Micore Board are shaped on the Delta Shaper machine.  This machine has one

four inch port connected to the shaper fence, which supplies dust collection directly at the point of machining.  In the third and final machining operation, the Onsrud Inverted Router is used to create a pocket in the back side of the Micore Board for support brackets.  This operation is only performed on half of the quantity ordered.  This machine has a six inch port connected to the bottom supplying dust collection directly to the point of machining and a four inch port connected to a hood located directly over the point of machining to supply dust collection for particles, if any, that are not collected from the bottom.  All of the aforementioned machines are connected to the main dust collection plenum leading to one of the two main dust collection systems.  <u>See</u> Declaration of Martin Sapko ¶9.

Dust and air entering the dust collection system through spiral pipes such as the ones described above are moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building.  The spiral pipes referenced above, are actually smooth on the inside for better dust collection.  The vacuum pulls dust and air from the factory to one of the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a hopper, which is also located outside of the UNICOR building.  The filtered air is then returned to the factory though square ducts.  The dust that is filtered from the factory air is collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory. <u>See</u> Declaration of Martin Sapko ¶10, and Attachments D-E.

The "Special Precautions" section of the Micore Board MSDS provides further support for the determination that a respirator was not necessary.  That section indicates that "[o]ver-exposure to dust can cause eye, skin, nose, throat or respiratory irritation... Do not cut with power equipment unless <u>either</u> a dust collector is used on the equipment <u>or</u> local exhaust is used

and NIOSH/MSHA-approved respirator is worn." <u>See</u> Declaration of Stephen Housler ¶¶ 21-24, and Attachment H.

This language is similar to, but not the same as, the warning contained on the Micore Board product label. The use and placement of the words <u>either</u> and <u>or</u> in the MSDS indicates that at times when the Micore Board is cut with power equipment, the factory could implement one of two precautions: either use a dust collector system, or use local exhaust and NIOSH/MSHA-approved respirators. Defendants reasonably opted to employ a dust collector system. <u>See</u> Declaration of Stephen Housler ¶ 25; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E. The MSDS does not indicate that, where a dust collector is used on the equipment, NIOSH-approved respirators are also required. <u>See</u> Declaration of Stephen Housler ¶¶ 21-24, and Attachment H. Defendants' interpretation of the applicable safety requirements for Micore Board is consistent with the findings of the OSHA inspectors, who recommended, <u>but did not require</u>, the use of NIOSH-approved respirators. <u>See</u> Declaration of Stephen Housler ¶ 18, and Attachment E.

In conclusion, Defendants properly relied on objective air quality data, results of the OSHA inspection of the UNICOR factory, and relevant MSDS sheets in making decisions about UNICOR factory conditions and necessary protective equipment. They were in no way deliberately indifferent to Plaintiff's health and safety in relying on this objective, federally sanctioned information, and Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim.[7]

---

[7] Plaintiff further alleges that Defendants violated his Eighth Amendment rights by altering the Material Safety Data Sheet (MSDS) for Micore Fiber. See Amended Complaint ¶ 21. Even if this allegation could satisfy Eighth Amendment standards, Plaintiff has provided no

**C.    To the Extent Plaintiff States a Claim Pursuant to the Fifth Amendment Substantive Due Process Clause, it is Foreclosed by the Eighth Amendment Claim**

As part of the First Count of his Complaint, Plaintiff alleges that the claims raised in the Second Amended Complaint deprived him of his rights under the Fifth Amendment of the Constitution.  See Complaint ¶ 35.

 It is well settled that if a constitutional claim is covered by a specific constitutional provision, it must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.  See U.S. v. Lanier, 520 U.S. 259, 272 n.7 (1997).  Any substantive due process claim raised by Plaintiff as a result of his alleged exposure to silica dust relates to a specific government behavior against which the Eighth Amendment explicitly protects.  Helling v. McKinney, 509 U.S. 25 (1993).  As such, Plaintiff cannot obtain relief pursuant to the Fifth Amendment Due Process Clause, and this claim must be dismissed with prejudice.[8]

---

evidence that he was actually harmed by the alleged alteration to the MSDS sheet.  Specifically, Plaintiff was not provided with a respirator because: a) it was determined that a respirator was not required, and b) he never requested one.  See Declaration of Martin Sapko ¶ 12; Declaration of Stephen Housler¶¶ 21-30; Declaration of Debora Forsyth ¶ 8.  An unauthorized marking or alteration which was allegedly made on the MSDS sheet, and never noticed by any staff member at the time, played no part in this calculus.  See Declaration of Martin Sapko ¶ 12; Declaration of Stephen Housler¶¶ 21-30; Declaration of Debora Forsyth ¶ 8. .  Finally, because copies of the MSDS sheets are readily available on the factory floor, any staff or inmate in the factory could place an unauthorized marking or alteration on an MSDS sheet.  Such handwritten alterations to an MSDS sheet are not authorized by Defendant Housler or anyone else in the institution.  See Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler¶¶ 32-34; Declaration of Debora Forsyth ¶ 9.  Nonetheless, if an alteration to the MSDS sheet had been brought to the attention of staff, it would have been replaced as soon as practicable.   See Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler¶¶ 32-34; Declaration of Debora Forsyth ¶ 9.

[8] To the extent Plaintiff's Complaint states a Procedural Due Process claim, that claim is clearly without merit.  In order to establish a procedural due process claim, Plaintiff must

**D.      Defendant LaManna Must Be Dismissed Because Plaintiff Has Plead No Claims Against Him And, Therefore, Can Show No Personal Involvement**

A plaintiff, in order to state a viable civil rights claim, must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of law; and 2) that said conduct deprived the Plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Stackhouse, 920 F.2d 1135, 1141-42 (3d Cir.1990).

An inmate must plead and later prove that some affirmative act or omission was committed by the individual Defendant to submit him to personal liability for the actions of another person.  Bracey v. Grenoble, 494 F.2d 566 (3d Cir. 1974).  Indeed, complaints combining conclusory allegations, absent reference to material facts, will not survive motions to dismiss. Geter v. Fortenberry, 849 F.2d 1550, 1553 (5th Cir. 1988).  See also Kennedy v. City of Cleveland, 797 F.2d 297 (6th Cir. 1986), cert. denied, 479 U.S. 1103 (1987); Cotner v. Hopkins, 795 F.2d 900 (10th Cir. 1986);  Elliott v. Perez, 751 F.2d 1472, 1482 (5th Cir. 1985)(a Plaintiff attempting to present a civil action against individual government officials must be able to present material facts on which he contends he can establish a right to recovery, such a Plaintiff should also be able to state those facts with some particularity, and finally must show why the official cannot show a valid defense of immunity).

---

demonstrate that he was deprived of a constitutionally-protected property or liberty interest. Daniels v. Williams, 474 U.S. 327, 339 (1986); Sandin v. Connor, 515 U.S. 472 (1995). Additionally, in order to state a due process claim, Plaintiff must be able to further show that he was denied an opportunity to be heard with regard to the conditions to which he was exposed.  Id. In his complaint, however, Plaintiff acknowledges that he exhausted the administrative remedy process that was made available to him with regard to the conditions in the UNICOR factory. See Complaint ¶8.  See also 28 C.F.R. § 542.10, et seq.  As a result, Plaintiff cannot support a claim that he was deprived of the procedural protections of the Due Process Clause.

Furthermore, the doctrine of respondeat superior cannot form the basis of a <u>Bivens</u> claim. <u>Robertson v. Sichel</u>, 127 U.S. 507, 515-17 (1988); <u>Rizzo v. Goode</u>, 423 U.S. 362, 371 (1976). Supervisory personnel are generally not liable in a civil rights action under the theory of vicarious liability. <u>Redman v. County of San Diego</u>, 942 F.2d 1435, 1446 (9th Cir.) (en banc), <u>cert. denied</u>, 502 U.S. 1074 (1992); <u>Hansen v. Black</u>, 885 F.2d 642, 645-646 (9th Cir. 1989); <u>See also</u> <u>Terrell v. Brewer</u>, 935 F.2d 1015, 1018 (9th Cir. 1991). To find a supervisory official personally liable for the unconstitutional acts of his subordinates, it must be shown that the supervisor had a duty to instruct the subordinate to prevent constitutional harm, and that "as a result of the official's failure to instruct, the Plaintiff was harmed in the manner threatened." <u>Haynesworth v. Miller</u>, 820 F.2d 1245, 1262 (D.C. Cir. 1987); <u>MacKinney v. Nielsen</u>, 69 F.3d 1002, 1008 (9th Cir. 1995); <u>Redman</u>, 942 F.2d at 1446-1447; <u>Hansen</u>, 885 F.2d at 646; <u>See also</u> <u>Larez v. City of Los Angeles</u>, 946 F.2d 630, 646 (9th Cir. 1991) (supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others.); <u>Hunt v. Dental Dept.</u>, 865 F.2d 198, 200 (9th Cir. 1989) (inmate fails to allege any facts showing role head of state department of corrections played in denial of dental care); <u>Ouzts v. Cummins</u>, 825 F.2d 1276, 1277 (8th Cir. 1987) (per curiam) (warden's responsibility for generally supervising the operations of the prison not sufficient to establish personal involvement). Therefore, personal involvement or some affirmative action on the part of a Defendant is necessary before he may be found liable for a civil rights violation. <u>See</u> <u>Rode v. Dellarciprete</u>, 845 F.2d 1195 (3d Cir. 1988); <u>Stoneking v. Bradford Area School District</u>,

882 F.2d 720, 729-30 (3d Cir.), cert. denied, 493 U.S. 1044 (1990).

A sufficient causal connection may be established by showing that the supervisor set in motion a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict the injury.  Larez, 946 F.2d at 645; Redman, 942 F.2d at 1447.  A supervisor may also be liable for constitutional violations by his subordinates if the supervisor knew of the violations and failed to prevent them.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984).  Finally, supervisors may be liable if the alleged deprivation resulted from a failure to properly train or supervise personnel, or from an official policy or custom for which the defendants were responsible.  Ybarra, 723 F.2d at 680.

Here, Plaintiff has not alleged any facts implicating Defendant LaManna in the alleged denial of any Constitutional rights.  Rather, Defendant LaManna has been named in this lawsuit solely based upon his position as the Warden and CEO of FCI McKean. Accordingly, the Plaintiff's claims against him should be dismissed for failure to show personal involvement.

### E.    All of the Federal Defendants Are Protected from Suit by the Doctrine of Qualified Immunity, Because None of Plaintiff's Clearly Established Constitutional Rights Were Violated

Summary Judgment is appropriate with regard to all of the named defendants based on the doctrine of qualified immunity.   A plaintiff may maintain an action for damages against a federal employee personally, thereby subjecting him or her to personal responsibility for payment of damages, for violating the plaintiff's constitutionally protected rights.  Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264 (1979); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999 (1971).  The Supreme Court, however,  has held that

federal executive officials, other than those performing adjudicatory or prosecutorial functions, are entitled to qualified good faith immunity from personal liability for civil damages. Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001); Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727 (1982); Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894 (1978).  "[G]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738.  See also Jeffers v. Gomez, 267 F.3d 895, 910-912(9th Cir. 2001).  This is an "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806 (1985); see also Hunter v. Bryant, 502 U.S. 224, 112 S.Ct. 534 (1991) (per curiam).  Therefore, once an individual raises qualified immunity in a Bivens action, the plaintiff cannot maintain the action against the federal official in his or her individual capacity unless the plaintiff can show that the defendant violated a clearly established Constitutional right. Siegart v. Gilley, 500 U.S. 226, 111 S.Ct. 1789 (1991); Abdul-Akbar v. Watson, 4 F.3d 195 (3rd Cir. 1993). This inquiry focuses on whether a reasonable official would have found the defendants' conduct to be illegal. Abdul-Akbar, 4 F.3d at 205; Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993), cert. denied, 114 S.Ct. 559 (1993).   Normally, qualified immunity should be decided by the court before trial. Hunter, 502 U.S. at 227, 112 S.Ct. at 536.  See also Cunningham v. Gates, 229 F.3d 1271 (9th Cir. 2000).  The Plaintiff has the burden of showing that the defendant federal employees violated his clearly established Constitutional rights.  Zeigler v. Jackson, 716 F.2d 847 (11th Cir. 1983).

The <u>Harlow</u> rule on qualified immunity was further clarified by the Supreme Court in <u>Anderson v. Creighton</u>, 483 U.S. 635, 107 S.Ct. 3034 (1987). as follows:

> [W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, ... assessed in light of the legal rules that were "clearly established" at the time it was taken.

<u>Id</u>. at 639, 107 S.Ct. at 3038-39 (citation to <u>Harlow</u> omitted). Both questions are to be decided by the court. This standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violated the law." <u>Hunter v. Bryant</u>, 502 U.S. 224, 229, 112 S.Ct. 534(1991) (per curiam) (<u>quoting</u> <u>Malley v. Briggs</u>, 475 U.S. 335, 343, 106 S.Ct. 1092(1986)). As long as a defendant government employee could reasonably have thought his actions were consistent with the rights he was alleged to have violated, the defendant federal employee is entitled to qualified immunity. <u>Anderson</u>, 483 U.S. at 638, 107 S.Ct. at 3038.

Government officials are not expected to be legal scholars like law professors. <u>Ward v. San Diego County</u>, 791 F.2d 1329, 1332 (9th Cir.), <u>cert. denied sub nom.</u>, <u>Duffy v. Ward</u>, 483 U.S. 1020, 107 S.Ct. 3263 (1987). The contours of the right allegedly violated must be sufficiently clear so that a reasonable government official would understand that his or her conduct violated the plaintiff's constitutional rights. Officers who reasonably but mistakenly conclude their conduct was lawful are entitled to immunity. <u>Anderson</u>, 483 U.S. at 641, 107 S.Ct. at 3039-40; <u>Hunter</u>, 502 U.S. at 228-229, 112 S.Ct. at 536-37.

Furthermore, the Supreme Court recently clarified the standard for the qualified immunity defense, making it much more difficult for Plaintiff to prevail. <u>Saucier v. Katz</u>, 533 U.S. 194,

121 S.Ct. 2151 (2001).  There, the Court held that the lower courts had been ignoring a

significant threshold question.  Specifically, this Court must consider whether, "[t]aken in the

light most favorable to the party asserting the injury, do the facts alleged show the officer's

conduct violated a constitutional right?"  Saucier, 533 U.S. at 200-01, 121 S.Ct. at 2156.   Only if

a constitutional violation could be made out from the Plaintiff's allegations does the analysis

move to the second sequential step, asking "whether the right in question was clearly

established."  Id.  The Court went on to caution, however, that this second inquiry, is not taken in

a broad, general context, but must be "undertaken in light of the specific context of the case."  Id.

The reason for such an analysis is to avoid treating prison administrators as attorneys, and

holding them to an impossible standard.  As such:

> The contours of the right must be sufficiently clear that a reasonable official would
> understand that what he is doing violates that right.  The relevant, dispositive inquiry in
> determining whether a right is clearly established is whether it would be clear to a
> reasonable officer that his conduct was unlawful in the situation he confronted.

Id. (internal citations omitted).  Thus, if the law "did not put the officer on notice that his

conduct would be clearly unlawful, summary judgment based on qualified immunity is

appropriate."  Id. (citing Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727 (1982); Malley v.

Briggs, 475 U.S. 335, 106 S.Ct 1092 (1986).

In the present case, Plaintiff has not shown that the Federal Defendants violated any of his

Constitutional rights.  See discussion in Sections B-D, supra.  Therefore, he has failed to

establish his burden of proof, as required by Saucier, Anderson and Harlow.  Assuming for the

sake of argument, however,  that any of Plaintiff's allegations constituted violations of his

Constitutional rights, none of those rights were so clearly established as to satisfy the second

prong of the <u>Saucier</u> analysis.

It is clear, therefore, that none of Plaintiff's clearly established Constitutional rights were intentionally violated by any of the named defendants.  As such, all of the defendants are entitled to Qualified Immunity.

**Federal Tort Claims Act**

**A.    Count Two of the Complaint, Which Raises A Claim Under the Federal Tort Claims Act, Must Be Dismissed for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1)**

**1.    Standard for Dismissal Pursuant to Rule 12(b)(1)**

A defense of lack of jurisdiction over the subject matter may come in one of two forms: a facial attack or a factual attack.  <u>Gould Electronics, Inc. v. United States</u>, 220 F.3d 169, 176 (3rd Cir. 2000); <u>Mortensen v. First. Fed. Sav. And Loan Ass'n.</u>, 549 F.2d 884, 891 (3rd Cir. 1977).  In a facial attack, the defense merely files a Rule 12 (b)(1) motion with no supporting documents, affidavits or other factual allegations.  <u>Id.</u>; <u>PBGC v. White</u>, 998 F.3d 1192, 1196 (3rd Cir. 1993); <u>Paterson v. Weinberger</u>, 644 F. 2d 521, 523 (5th Cir. 1981).  In reviewing a facial attack, therefore, the court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." <u>Id.</u>

The Court, however, is not limited to the face of the complaint in determining a Rule 12(b)(1)motion.  In a factual attack, the court may also consider evidence outside the pleadings, including affidavits, testimony, depositions, documents and other evidence to resolve factual issues bearing upon jurisdiction.  <u>Gould Electronics</u>, 220 F.2d at 176; <u>Gotha v. United States</u>, 115 F.3d 176, 178-79 (3rd Cir. 1997);  <u>Biotecs Research Corp. v. Heckler</u>, 710 F.2d 1375, 1379 (9th Cir 1983) (consideration of materials outside the pleadings will not convert a 12(b)(1) motion

into one for summary judgment).[9]

Regardless of whether the motion is based upon a facial attack or a factual attack, once the defense of lack of jurisdiction over the subject matter is raised, the Plaintiff bears the burden of showing why the case should not be dismissed.  Gibbs v. Buck, 307 U.S. 66, 72, 59 S.Ct. 725 (1939); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3rd Cir.), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839 (1991); Mortensen, 549 F.2d at 891.  Plaintiff's burden, however, is lighter than a motion to dismiss pursuant to Rule 12(b)(6).  Dismissal here is only appropriate where, "the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a Federal controversy." Growth Horizons, Inc. v. Delaware Cty., Pa., 938 F.2d 1277, 1280-81 (3rd Cir. 1993)(citing cases).

The United States, as a sovereign is immune from lawsuit except to the extent it consents to be sued.  FDIC v. Meyer, 510 U.S. 471, 475, 114 S.Ct. 996 (1994); Lehman v. Nakshian, 453 U.S. 156, 101 S.Ct. 2698 (1981); Matsko v. United States, 372 F.3d 556 (3rd Cir. 2004).  Thus, it is axiomatic that unless the United States expressly waives this immunity, a district court will have no subject matter jurisdiction to hear the suit.  Meyer, 510 U.S. at 475, 114 S.Ct. at 100; U.S. v. Mitchell, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965 (1983); U.S. v. Testan, 424 U.S. 392, 96 S.Ct. 948 (1976).  Further, there can be no consent by implication or by use of ambiguous language.  Library of Congress v. Shaw, 478 U.S. 310, 318, 106 S.Ct. 2957, 2963 (1986); United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351-52 (1980)(waiver of sovereign

---

[9] Unlike a Rule 12(b)(6) motion, in a Rule 12(b)(1) Motion to Dismiss, the Court may resolve issues of fact relating to jurisdiction for itself.  Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396 (1981); Biase v. Kaplan, 852 F. Supp. 2d 268, 277 (D. NJ 1994).

immunity may not be found in the absence of unequivocally expressed Congressional intent.)

In the case of actions sounding in tort, however, Congress has expressly issued a limited waiver of sovereign immunity in the Federal Tort Claims Act, 28 U.S.C. §§ 1346 2671, *et seq.* Livera v. First National State Bank of New Jersey, 879 F.2d 1186, 1194 (3rd Cir), cert. denied sub nom, Livera v. United States Small Business Ass'n, 493 U.S. 937, 110 S.Ct. 332 (1989); Matsko, 372 F. 3d at 558; Gotha, 115 F.3d at 179.  This is the only waiver of sovereign immunity for actions sounding in tort against the United States, and it must be strictly construed, and all doubt is to be resolved in favor of the government.  Meyer, 510 U.S. at 474-75, 114 S.Ct. at 1000-01. Further, limitations placed upon the waiver are to be expansively reviewed, and only express exceptions to these limits may be recognized.  U.S. v. Nordic Village, Inc., 503 U.S. 30, 112 S.Ct. 1011 (1992); Bowen v. City of New York, 476 U.S. 467, 106 S.Ct. 2022 (1986); Block v. North Dakota, ex rel. University and School Lands, 461 U.S. 273, 103 S.Ct. 1811 (1983); Soriano v. U.S., 352 U.S. 270, 77 S.Ct. 269 (1957); U.S. v. King, 395 U.S. 1, 89 S.Ct. 1501 (1969). Thus, if any limitations upon this waiver of sovereign immunity apply, then a 12(b)(1) Motion to Dismiss for Lack of Jurisdiction over the Subject Matter is the appropriate means for disposal of the action against the United States.  Matsko, 372 F. 3d at 558(The district court may only exercise jurisdiction if the FTCA waives sovereign immunity).

### B.    **Plaintiff Did Not Exhaust His Administrative Tort Claim Prior to Filing this Action, As Is Required By Statute**

Plaintiff's claim against the United States, filed under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2675, et seq.,(hereinafter "FTCA") should be dismissed for lack of subject matter jurisdiction, because Plaintiff did not fully exhaust his administrative remedies under the

FTCA **prior** to the filing of the complaint in this civil action.  28 U.S.C. § 2675(a).

As was discussed above, it has long been recognized that the FTCA represents a limited qualified waiver of sovereign immunity.  The FTCA permits an action against the United States for the alleged wrongful acts or omissions of government employees; suit under the FTCA provides the exclusive remedy for negligent conduct by federal employees.  28 U.S.C. § 2679. Any action under the FTCA requires scrupulous adherence to the Act's terms and procedural requirements, e.g., prior presentation and denial of an administrative claim.

In  28 U.S.C. § 2675(a), Congress specifically provides:

(a) An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, **unless the claimant shall have first presented the claim to the appropriate Federal agency and his claims shall have been finally denied by the agency in writing** (emphasis added).

In requiring the filing and denial of an administrative claim, Congress intended to "ease court congestion and avoid unnecessary litigation, while making it possible for the government to expedite the fair settlement of tort claims asserted against the United States.  S.Rept.No. 1327, 89 Cong., 2d Sess. 6, reprinted in (1966) 2 U.S. Code Cong. & Admin. News, 2515, 2516; McNeil v. United States, 508 U.S. 106, 112 n.8 (1993).

These provisions are clear and mandatory.  McNeil, 508 U.S. at 111-13; Wujick v. Dale & Dale, Inc., 43 F.3d 790, 793-94 (3d Cir. 1994)(noting that administrative exhaustion under FTCA is mandatory and the Supreme Court "firmly rejected"  the "no harm, no foul" reasoning); Melo v. United States, 505 F.2d 1026, 1028 (8th Cir. 1974);  Bialowas v. United States, 443 F.2d 1047, 1049 (3d Cir. 1971) (requiring a claim be submitted to and finally denied by the

appropriate federal agency before filing a lawsuit); Wilder v. Luzinski, 123 F.Supp.2d 312, 313-14 (E.D.Pa. 2000).

Because the FTCA represents a conditional limited waiver of sovereign immunity, the statutory requirements respecting presentation and final denial of an administrative claim are jurisdictional and cannot be waived by representatives of the federal government. See, e.g., Livera v. First National State Bank of New Jersey, 879 F.2d 1186, 95 (3d Cir.), cert. denied, 493 U.S. 937 (1989); Bradley v. United States, 856 F.2d 575, 577-79 (3d Cir. 1988), *vac'd on other gds.*, 490 U.S. 1002 (1989), on remand, 875 F.2d 65 (3d Cir. 1989); Bialowas, 443 F.2d at 1048-49. Thus, if a plaintiff files suit without first having submitted a timely claim for administrative adjustment, the suit must be dismissed. McNeil, 508 U.S. at 112-13.

In this case, Plaintiff filed the complaint in this civil action with this Court on December 9, 2003. See Docket No. 5. At that time, although Plaintiff alleged a negligence claim in his complaint, he had not submitted any administrative tort claims relating to the allegations against FCI McKean. Nor has he attempted to resolve this matter administratively since that time.[10] See Declaration of Joyce Horikawa ¶ 3-4.

Therefore, because Plaintiff did not exhaust his available administrative remedies under the FTCA, this Court lacks subject matter jurisdiction over the FTCA portion of this lawsuit. 28 U.S.C. § 2675(a); McNeil, supra. Thus, the Second Count of Plaintiff's Second Amended Complaint must be dismissed.

_____

[10] Even if Plaintiff were to file an administrative claim now, this defect could not be cured. Duplan v. Harper, 188 F. 3d 1195 (10th Cir. 1999); Gaerman v. FBI, 2003 WL 23537963 (D. Or. 1995); Webster v. U.S., 2005 WL 3031154 (E.D. Cal. 2005); Sparrow v. US Postal Service, 825 F.Supp. 252, 254-55 (E.D.Cal. 1993).

**C.**   **Plaintiff's Claim Against the United States Is Barred by the Prison Industries Fund, 18 U.S.C. § 4126(c)(4), Which Provides Procedures for Compensating Inmates Who Have Been Injured at Their Institution Work Assignment**

It is now well settled that the exclusive remedy for any injury suffered by an inmate during the course of his work assignment is the Inmate Accident Compensation system, 18 U.S.C. § 4126(c)(4).  U.S. v. Demko, 385 U.S. 149, 151-52, 87 S.Ct. 382, 384 (1966); Joyce v. United States, 474 F.2d 215, 219 (3rd Cir. 1973)(discussing the same issue with respect to the analogous FECA statute); Vaccaro v. Dobre, 81 F.3d 854, 857 (9th Cir. 1996)(Demko establishes that 18 U.S.C. § 4126 is the exclusive remedy against the government); Aston v. U.S., 625 F.2d 1210, 1211 (5th Cir. 1980)(citing Demko); Granade v. U.S., 356 F.2d 837, 840-41 (2nd Cir.), cert. denied 385 U.S. 1012, 87 S.Ct. 720 (1967).   Thus, the FTCA's waiver of sovereign immunity does not and cannot extend to actions relating to an injury suffered by an inmate during the course of performing his institution work assignment.  Demko, 385 U.S. at 151-52, 87 S.Ct. at 384.

Therefore, if Plaintiff's allegations indicate that his injury was incurred while working, then this Court must dismiss the Complaint for lack of Subject Matter Jurisdiction.  Demko, 385 U.S. at 153, 87 S.Ct. at 385; Premachandra v. U.S., 739 F.2d 392, 394 (8th Cir. 1984)(a precisely drawn, detailed statute pre-empts more general remedies); Aston, 625 F.2d at 1211 (where an inmate was injured "on the job", the district court lacks jurisdiction to hear a cause of action grounded on the Federal Tort Claims Act); Wooten v. United States, 825 F.2d 1039, 1044 (6th Cir. 1987)(whether Plaintiff's injuries were caused by the performance of work is irrelevant; as long as the injury occurred while the inmate was on the job, section 4126 is the exclusive remedy.)

In the present case, it is clear from the face of the complaint that Plaintiff was "on the job". To be sure, the very heart of Plaintiff's complaint is centered upon the conditions at his UNICOR work assignment. Notably, Plaintiff does not allege he has been exposed to unsafe conditions anywhere else within the prison, or in any other prison. His allegation is solely that the air quality in the FPI factory was unsafe. Therefore, it is impossible to conclude that Plaintiff's FTCA claim refers to anything other than the conditions at his institution work assignment; precisely the type of claim covered by section 4126. Thus, the allegations raised pursuant to the FTCA must be dismissed because section 4126 is Plaintiff's exclusive remedy against the United States.

## V.    Conclusion

WHEREFORE, for the reasons stated above, Defendants' Motion To  Dismiss Or For Summary Judgment should be granted with a certification that any appeal would be deemed frivolous, lacking in probable cause, and not taken in good faith.

Respectfully Submitted,

MARY BETH BUCHANAN
United States Attorney

/s/ Michael C. Colville
MICHAEL C. COLVILLE
Assistant U.S. Attorney
Western District of PA
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7337
PA ID No. 56668

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the within **BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGEMENT** was served, by either electronic means or by postage paid U.S. Mail, to and upon the following:

Richard A. Lanzillo, Esquire
Knox McLaughlin Gornall & Sennett, P.C.
120 West Tenth Street
Erie, PA 16501-1461


 /s/ Michael C. Colville    
MICHAEL C. COLVILLE
Assistant U.S. Attorney


Dated:  February 16, 2006