**Westlaw Download Summary Report for GOLDRING,DOUG 5288651**

| | |
|---|---|
| Date/Time of Request: | Wednesday, January 31, 2007 14:06:00 Central |
| Client Identifier: | DOJ |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 358 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 816919 (W.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
Briefs and Other Related Documents
Wooten v. GoordW.D.N.Y.,2004.Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
Fred WOOTEN, 96-B-1321, Dionisio Hernandez, Jr., 95-A-8440, and Jones Sommerville, 96-B-0131, Plaintiffs,
v.
Glenn S. GOORD, John Conroy, Michael Graziano, Floyd G. Bennett, David Barrett, Martin Abbott, Dana Smith and William J. Hopkins, Defendants.
No. 02-CV-0268E(F).

March 25, 2004.

Fred Wooten, Elmira, NY, pro se.
Dionisio Hernandez, Jr., Elmira, NY, pro se.
Jones Sommerville, Elmira, NY, pro se.
Michael A. Siragusa, Buffalo, NY, for Defendants.

MEMORANDUM and ORDER [FN1]

FN1. This decision may be cited in whole or in any part.ELFVIN, J.

*1 The abovenamed *pro se* prisoners commenced this action pursuant to 42 U.S.C. § 1983 alleging that defendants had violated their Eighth Amendment rights. Defendants have filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCvP") dismissing plaintiffs' claims. For the reasons stated hereinbelow, defendants' motion will be granted.

The following facts, construed favorably for the plaintiffs, are undisputed unless otherwise noted. Plaintiffs are inmates at the Elmira Correctional Facility ("ECF"). Defendants are all employees of the New York State Department of Correctional Services ("DOCS"). Plaintiffs all worked in the ECF Industry Print Shop ("Print Shop"). DOCS also employs civilians to work in the Print Shop. Such civilian employees are members of the Civil Services Employment Association ("CSEA") labor union. Plaintiffs allege that they suffered injuries as a result of the conditions in the Print Shop and that defendants also violated workplace safety standards relating to sound levels, lighting, ventilation and lack of showers. Specifically, plaintiffs make the following claims regarding the conditions in the Print Shop: (1) that glare from the lighting caused them eyestrain, (2) that they were not allowed to shower in the Print Shop after each work day, (3) that the noise levels caused them hearing loss and (4) that the ventilation system was inadequate, causing them headaches, nausea, skin irritations, increased blood pressure and sinus problems. Compl., at 5.

In support of their claims, plaintiffs have offered the results of two separate inspections regarding the conditions in the Print Shop. On December 23, 1997, Edward L. King, an Occupational Safety and Health Administration ("OSHA") specialist for the CSEA, conducted a safety and health walk-through of the Print Shop. In his subsequent report, King reported that the overhead lights were too low to the floor and that "CSEA workers are being affected by the intense glare on work surfaces in the shop area." Decl. of David Barrett, Ex. A ¶ 1. King also reported that he registered noise levels in the Print Shop ranging from 78 decibels to 87 decibels.[FN2] *Id.* ¶ 2. With regard to the ventilation system, King noted that he had a concern with the efficiency of the ventilation system [FN3] and also reported that he had some concerns with the "ability of [the] ventilation system to remove toxic chemicals from the breathing zones of the workers in order to create a safe working environment." *Id.* ¶ 6. King made no specific findings regarding the air quality or the presence of toxic chemicals in the air. He recommended only the need to address the ventilation system in order to "satisfy the concerns of the CSEA workers." *Ibid.*

FN2. King also noted that, according to OSHA regulations, employees must be placed in a hearing conservation program when employees are exposed to average noise levels of 85 decibels or greater during an eight-hour shift.

FN3. Apparently, such concerns were prompted by complaints made by CSEA workers and the fact that there was an excessive amount of white dust covering much of the pertinent work areas. King concluded that the white dust was press powder, a "non-hazardous material, which is basically corn/potato/sago starch." Barrett Decl., Ex. A ¶ 4.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 2
Not Reported in F.Supp.2d, 2004 WL 816919 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

On July 17, 1998 Gregory Siwinski, a Certified Industrial Hygienist for the Central New York Occupational Health Clinical Center, conducted an Industrial Hygiene Evaluation of the Print Shop. Siwinski reported that the low positioning of the lights had caused glare and glare-related complaints, such as eyestrain and headaches, by some civilian employees. *Id.*, Ex. B, at 6. With regard to the ventilation system, Siwinski noted that the system was not operating properly inasmuch as it was not bringing enough outside air into the Print Shop. *Id.* at 3. He recommended an adjustment to the air intake louvers so that the rate of air intake could be increased to levels that would be acceptable according to the standards set by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE"). *Ibid.* Siwinski also reviewed and identified possible sources of pollutants in the Print Shop. In particular, Siwinski identified various solvents that were being used in the Print Shop and provided information regarding the hazardousness of three of them - to wit, VM & P naphtha, isopropyl alcohol and methylene chloride. *Id.* at 4-5. Siwinski outlined the health concerns associated with exposure to such solvents and recommended that the use of methylene chloride be discontinued. [FN4] Finally, Siwinski reported that the build-up of dust in the Print Shop was most likely from paper dust and spray powder used in the printing process. He concluded that such dusts "are not considered to have significant health risk to the respiratory system." *Id.* at 5.

> FN4. Barrett states that "[a]t one time, in an attempt to alleviate concerns, I researched possible less-toxic alternatives for the chemicals that we used in the Print Shop. However, my research concluded that there was nothing that would perform as effectively as the chemicals that were already in use." Barrett Decl. ¶ 19.

*2 The issue regarding the ventilation system in the Print Shop was discussed at several meetings among CSEA workers and management. *See* Decl. of William J. Hopkins, Ex. A. At two meetings in March and July 1998, management explained the steps that were being taken to improve the ventilation system. *See ibid.* Two subsequent inspections were conducted of the air quality in the Print Shop. In October 2000, Martin Abbott, a New York State DOCS Associate Industrial Hygienist, conducted an Industrial Hygiene Survey of the Print Shop. The purpose of the survey was to determine if employees working in the Print Shop were being exposed to hazardous chemicals at levels above the standards set by the Public Employee Safety and Health Bureau ("PESH"). Abbott Decl. ¶ 5. Abbott determined that all of the substances that he tested for in the air were well below the permissible exposure limits set by PESH. *See id.*, Ex. A. [FN5] Abbott also inspected the ventilation system in the Print Shop and, although he noted that the ventilation system was not performing at an optimal level, he determined that there was no significant deficiency of fresh air in the Print Shop. *Id.* ¶ 12. Based on his testing, Abbott concluded that the air quality in the Print Shop "did not pose an unreasonable risk of severe damage to Print Shop employees' health." [FN6] *Id.* ¶ 13. In September, 2002, a survey of the air quality in the Print Shop was performed by Anthony Fitzpatrick, a Public Health Sanitarian with the Chemung County Health Services Department, in response to an inmate complaint. Fitzpatrick reported that he could not detect any obvious fumes or odors in the Print Shop and that the air temperature and relative humidity were acceptable according to the standards set for indoor air quality by ASHRAE. *See* Decl. of William J. Hopkins, Ex. E. In addition, Fitzpatrick noted that the ventilation system appeared to be performing adequately based on an air balance test that had been previously conducted in April 2002. *Ibid.*

> FN5. Abbott performed his tests for air quality using the approved methods of the National Institute for Occupational Safety and Health. *See* Abbott Decl., Ex. A ("Methods and Procedures").

> FN6. Significantly, although Siwinski had previously recommended that the use of methylene chloride as a solvent be discontinued due to its toxicity, Abbott concluded that "[t]he results of the air sampling for * * * methylene chloride are well within the acceptable levels as required by PESH." Abbott Decl., Ex. A; *see also id.,* Table 1.

Plaintiffs filed Inmate Grievance Complaints with regard to the noise, lack of showers and ventilation system in the Print Shop. The Inmate Grievance Resolution Committee ("IGRC") recommended that the Print Shop showers be reinstated and noted that, at the time, the ventilation system was currently being improved. Decl. of Floyd G. Bennett, Ex. F. Plaintiffs appealed the IGRC's recommendation to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 816919 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Bennett, who was ECF's Superintendent from April 1996 to October 2002. Bennett subsequently issued a July 20, 2001 decision whereby it was decided that the showers in the Print Shop would not be restored. Bennett reasoned that plaintiffs, as well as other inmates working in the Print Shop, had access to daily showers in other areas of the facility and that restoring the showers would disrupt the critical balance of humidity and temperature in the Print Shop. *Id.*, Ex. H. Plaintiffs finally appealed to the Central Office Review Committee ("CORC"). The CORC concurred with Bennett and noted that "testing in the [print] shop has confirmed that the *air quality is not a health hazard."* Addendum to Pls.' Compl. (emphasis added).

*3 ECF work programs are voluntary and participating inmates are free to choose where they work. None of the plaintiffs ever requested reassignment to a different work program or refused to work in the Print Shop due to its conditions. In fact, Wooten and Sommerville [FN7] still work in the Print Shop.[FN8]

> FN7. Plaintiff Jones Sommerville has sometimes been erroneously referred to as Sommerville Jones in the parties submissions. However, it appears from his signatures that his correct name is Jones Sommerville.
>
> FN8. Hernandez was permitted to withdraw from working in the Print Shop due to an issue unrelated to workplace conditions.

FRCvP 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether summary judgment is appropriate, this Court must draw all factual inferences in favor of the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Nevertheless, the non-moving party must rebut the motion for summary judgment with more than conclusory allegations and general denials. FRCvP 56(e); *see also Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) ("conclusory allegations, conjecture and speculation * * * are insufficient to create a genuine issue of fact"). Furthermore, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[FN9]

> FN9. The Court is also mindful of the fact that it must construe plaintiffs' pleadings liberally. *See McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004) (holding that "when the plaintiff proceeds *pro se,* * * * a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.").

The conditions under which a prisoner is confined can give rise to an Eighth Amendment violation. *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The inquiry is whether defendants acted with " 'deliberate indifference' to a substantial risk of serious harm" to plaintiffs. *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Such cases involve a two-prong inquiry - to wit, plaintiffs must show both an objective and a subjective element. The objective element requires plaintiffs to show that defendants' "transgression was sufficiently serious." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quotation marks omitted). To satisfy the subjective element, plaintiffs must show that defendants "acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.,* with 'deliberate indifference to inmate health or safety." ' *Ibid.* (quoting *Farmer,* at 834). Regarding the objective element, "while the Constitution does not mandate comfortable prisons, * * * prisoners may not be denied the minimal civilized measure of life's necessities." *Ibid.* (quotation marks and internal citation omitted). States may not deprive prisoners of their "basic human needs-*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling,* at 32.[FN10] "Nor may prison officials expose prisoners to conditions that pose an unreasonable risk of serious damage to their future health." *Phelps,* at 185 (punctuation marks and citation omitted). To satisfy the objective element of their Eighth Amendment claim, plaintiffs must ultimately "prove that the conditions of [their] confinement violate contemporary standards of decency." *Ibid.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:03-cv-00355-SJM-SPB     Document 70-42     Filed 02/02/2007     Page 5 of 6

Not Reported in F.Supp.2d                                                                                     Page 4
Not Reported in F.Supp.2d, 2004 WL 816919 (W.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

> FN10. Quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199-200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

*4 With regard to the subjective element, plaintiffs must show that defendants both knew of and disregarded an excessive risk to their health or safety. To do so, plaintiffs must show that defendants were both "aware of facts from which the reasonable inference could be drawn that a substantial risk of serious harm exist[ed], and [they] must also draw the inference." *Phelps,* at 186 (quoting *Farmer,* at 837).

It should be noted from the outset that plaintiffs' evidence in opposition to defendants summary judgment motion consists solely of the two reports issued by Siwinski and King. In essence, all three plaintiffs contend that such reports, which reveal various problems with the conditions in the Print Shop, show that defendants subjected them to cruel and unusual punishment. Thus, the issue before the Court is whether there is a genuine issue of material fact that any such conditions amounted to a violation of the Eighth Amendment.

Plaintiffs have not shown that the alleged prison conditions in the Print Shop were sufficiently serious to satisfy the objective element of their Eighth Amendment claim. To begin, plaintiffs have not shown that the lack of operable showers in the Print Shop amounts to a constitutional violation. Plaintiffs have not rebutted defendants' evidence that the plaintiffs had access to showers elsewhere in the prison at least once every day. As such, plaintiffs have failed to show that the inability to shower in the Print Shop somehow violates basic "standards of human decency." *Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988). Summary judgment will therefore be granted to defendants with regard to plaintiffs' allegations that they were denied adequate shower facilities. *See Beckford v. Portuondo,* 151 F.Supp.2d 204, 211 (N.D.N.Y.2001) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."); *Cosby v. Purkett,* 782 F.Supp. 1324, 1329 (E.D.Mo.1992) (holding that prisoner had not shown an Eighth Amendment violation because he was allowed to shower once every seventy-two hours); *Davenport v. DeRobertis,* 844 F.2d 1310, 1316-1317 (7th Cir.1988) (finding one shower a week for prisoners to be constitutionally sufficient).

Plaintiffs also have not shown that the lighting conditions and resulting glare posed a serious or unreasonable risk to their health. Although the reports by King and Siwinski suggest that the lights in the Print Shop had caused some glare and resulted in complaints of eyestrain and headaches by CSEA workers, plaintiffs have not shown either that they suffered from the same type of glare or that such glaring posed a risk to their health. Plaintiffs have not rebutted defendants' evidence that plaintiffs did not work under the same lights as had the CSEA employees. Defs.' Statement of Facts ¶¶ 33-39. In addition, assuming *arguendo* that plaintiffs were subjected to the same glaring that is indicated in the relevant reports, plaintiffs do not dispute defendants' assertion that the glaring problem was resolved shortly thereafter with the installation of a shielding device. *Id.* at 33. Moreover, plaintiffs have not shown that they suffered any diagnosable eye condition as a result of the glaring or that their exposure to such glaring was severe or consistent enough to cause them to suffer from a serious medical condition. *See Amaker v. Goord,* 2002 WL 523371, at *6-8 (S.D.N.Y.2002) (granting summary judgment against prisoner who had complained of eyestrain and other vision problems allegedly due to inadequate lighting conditions because, *inter alia,* he had not shown any evidence of a diagnosable eye condition).

*5 Plaintiffs also allege that the noise levels in the Print Shop exceeded the "norm of 85 decibels causing [them] hearing loss." Pls.' Compl., at 5. Plaintiffs entire evidence of excessive noise levels in the Print Shop is based on King's report, wherein he measured the noise level to be 87 decibels near a Print Shop machine. In addition, King noted that the noise levels that he measured may not have been representative of normal conditions in the Print Shop inasmuch as "normal operations were not being conducted at [the] time." Barrett Decl., Ex. A, at 2. However, evidence of a one-time measurement of the noise level in the Print Shop - which was two decibels above OSHA regulations -is insufficient to show that such conditions were objectively serious. First, the OSHA standard regarding noise level is an average figure based on an eight-hour workday. Plaintiffs worked fewer than eight hours in a day.[FN11] Second, there is no evidence that excessive noise levels were maintained in the Print Shop for any appreciable amount of time. Third, assuming that noise levels were consistently above the 85-decibel level, plaintiffs were afforded the opportunity to wear earplugs. Lastly, plaintiffs' have offered no evidence that exposure to such noise levels caused them any damage, or posed any serious risk of damage, to their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 816919 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

hearing.

> FN11. Plaintiffs worked each day in the Print Shop for approximately a two hour and forty-five minute shift in the morning and a three and one-half hour shift in the afternoon. Hopkins Decl. ¶ 11.

Finally, plaintiffs have not shown that the allegedly poor ventilation in the Print Shop was serious enough to satisfy the objective element of their Eighth Amendment claim. Both reports by King and Siwinski show that each had recommended improvements to the ventilation system in the Print Shop due to their concerns about possible poor air quality. However, neither report indicates that the air quality or ventilation system was not in compliance with federal workplace safety standards. In addition, subsequent inspections of the air quality and ventilation in the Print Shop showed that the workers were not being excessively exposed to hazardous materials. Plaintiffs have offered no evidence to show that such tests were erroneous or unreliable and their simple reliance on the reports by King and Siwinski, without more, is insufficient to raise a genuine issue of material fact that the ventilation system, or air quality, in the Print Shop posed a serious risk to their health.

Finally, assuming *arguendo* that plaintiffs had raised a triable issue of fact with regard to the objective element, they cannot satisfy the subjective element of their Eighth Amendment claims. The only credible evidence in the record that could tend to show that defendants were aware of an excessive risk to plaintiffs' health are the reports issued by King and Siwinski that revealed concerns about the ventilation system in the Print Shop. Although such reports certainly put defendants initially on notice that the ventilation system might have needed improvements, it cannot reasonably be found that, based on such reports, defendants were aware of an excessive risk to plaintiffs' health. In addition, any claim that defendants were aware that the conditions in the Print Shop posed an excessive risk to plaintiffs' health is belied by the subsequent inspections of the Print Shop, which revealed that the air quality was acceptable according to federal standards. The record simply does not support a finding that there is a genuine issue of material fact that defendants' were both aware of, and disregarded, an excessive and serious risk to plaintiffs' health.

*6 Accordingly, it is hereby ORDERED that the defendants' motion for summary judgment is granted and that the Clerk of this Court shall close this case.

W.D.N.Y.,2004.
Wooten v. Goord
Not Reported in F.Supp.2d, 2004 WL 816919 (W.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:02cv00268 (Docket) (Apr. 09, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.